# No. 14-55789

IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**JAMES A. BADAME and DIANE M. BADAME,**
*Plaintiffs—Appellants,*

*v.*

**JP MORGAN CHASE BANK, NA,**
*Defendant—Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA
PERCY ANDERSON, DISTRICT JUDGE • CASE NO. 2:13-CV-05425

# APPELLANTS' REPLY BRIEF

| | |
|---|---|
| **HORVITZ & LEVY** LLP | **GREBOW & RUBIN,** LLP |
| PEDER K. BATALDEN | ARTHUR GREBOW |
| LISA M. FREEMAN | JULIE H. RUBIN |
| 15760 VENTURA BOULEVARD, 18TH FLOOR | 16133 VENTURA BOULEVARD, SUITE 260 |
| ENCINO, CALIFORNIA 91436-3000 | ENCINO, CALIFORNIA 91436 |
| (818) 995-0800 | (818) 783-1100 |

ATTORNEYS FOR PLAINTIFFS—APPELLANTS
**JAMES A. BADAME AND DIANE M. BADAME**

# TABLE OF CONTENTS

**Page**

INTRODUCTION.........................................................................1

ARGUMENT ...............................................................................4

I. THE DISTRICT COURT ERRED IN DENYING REMAND BECAUSE CHASE'S REMOVAL WAS IMPROPER......................4

    A. Chase *could* have removed the action based on the original complaint; hence Chase *could not* properly remove later. ............................................................4

        1. An action is removable when the elements of diversity jurisdiction are facially apparent from the complaint—whether or not plaintiffs plead them expressly...............................................................4

        2. It is facially apparent from the original complaint that the Badames sought damages exceeding $75,000. ..................................................................7

        3. It is facially apparent from the original complaint that the Badames are California citizens and Chase is not. ...............................................................8

    B. Under *Shamrock*, Chase's procedural errors in removal warrant vacatur of the judgment and a remand to state court, and nothing in *Caterpillar* requires a different result.......................................................................10

II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO CHASE BECAUSE MOST OF THE BADAMES' CLAIMS PRESENT TRIABLE ISSUES OF MATERIAL FACT.....................................................................13

    A. *Negligence*. There is a triable factual issue as to whether Chase breached its duty to act with reasonable care in handling the Badames' loan modification. ...........................13

i

1. California decisions now recognize that a lender owes a duty of care once it agrees to consider and process a loan modification application......................13

2. The *Biakanja* factors confirm the existence of that duty..............................................................................16

3. The record reveals a triable issue of fact as to whether Chase breached its duty to act with reasonable care while processing the Badames' loan modification.................................................................22

4. Chase's conduct harmed the Badames. .......................22

B. *Fraud and negligent misrepresentation.* There are triable issues about whether Chase made negligent misrepresentations—or lied—to the Badames....................26

1. Fraud and negligent misrepresentation claims involve deceit. Despite its name, negligent misrepresentation is not a species of negligence.........26

2. The Badames' evidence showed Chase was affirmatively deceitful or unreasonably untruthful....27

3. Chase's deceit harmed the Badames. ..........................30

4. The record supports the Badames' concealment theory..........................................................................31

C. *UCL violation.* The record shows Chase acted unfairly and fraudulently during the loan modification process. ......32

CONCLUSION ..........................................................................36

CERTIFICATION OF COMPLIANCE ...................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aas v. Superior Court,*
24 Cal. 4th 627 (2000)...............................................................19, 20

*Abrego Abrego v. Dow Chem. Co.,*
443 F.3d 676 (9th Cir. 2006)...............................................................12

*Agostini v. Felton,*
521 U.S. 203 (1997)...........................................................................10

*Alvarez v. BAC Home Loans Servicing, L.P.,*
228 Cal. App. 4th 941 (2014) .................................................... *passim*

*Beacon Residential Cmty. Ass'n v. Skidmore, Owings &
Merrill LLP,*
59 Cal. 4th 568 (2014)........................................................................13

*Biakanja v. Irving,*
49 Cal. 2d 647 (1958) ............................................................... *passim*

*Bily v. Arthur Young & Co.,*
3 Cal. 4th 370 (1992).........................................................................27

*Caterpillar Inc. v. Lewis,*
519 U.S. 61 (1996)............................................................1, 2, 11, 12

*Destfino v. Reiswig,*
630 F.3d 952 (9th Cir. 2011)...............................................................11

*Harris v. Bankers Life & Casualty Co.,*
425 F.3d 689 (9th Cir. 2005).......................................................4, 5, 9

*Jolley v. Chase Home Finance, LLC,*
213 Cal. App. 4th 872 (2013) ........................................................3, 19

*Korea Supply Co. v. Lockheed Martin Corp.,*
29 Cal. 4th 1134 (2003)......................................................................33

iii

*Kuxhausen v. BMW Financial Services NA LLC*,
    707 F.3d 1136 (9th Cir. 2013) ............................................... 4, 5, 6, 7, 8

*Lueras v. BAC Home Loans Servicing, LP*,
    221 Cal. App. 4th 49 (2013) ....................................................... 24, 26

*Medrano v. Caliber Homes Loans, Inc.*,
    No. EDCV 14-02038-VAP (DTBx), 2014 WL 7236925
    (C.D. Cal. Dec. 19, 2014) ................................................................. 15

*Nymark v. Heart Federal Savings & Loan Ass'n*,
    231 Cal. App. 3d 1089 (1991)...................................................... 14, 35

*Parrino v. FHP, Inc.*,
    146 F.3d 699 (9th Cir. 1998)............................................................. 12

*Rufini v. CitiMortgage, Inc.*,
    227 Cal. App. 4th 299 (2014) ........................................................... 26

*Sabella v. Wisler*,
    59 Cal. 2d 21 (1963) ................................................................... 16, 17

*Scott v. Ross*,
    140 F.3d 1275 (9th Cir. 1998)........................................................... 26

*Segura v. Wells Fargo Bank, N.A.*,
    No. CV-14-04195-MWF (AJWx), 2014 WL 4798890
    (C.D. Cal. Sept. 26, 2014) ................................................................ 15

*Shamrock Oil & Gas Corp. v. Sheets*
    313 U.S. 100 (1941).................................................................... 1, 12

*Stewart v. Cox*,
    55 Cal. 2d 857 (1961) ...................................................................... 13

*Sutcliffe v. Wells Fargo Bank, N.A.*,
    283 F.R.D. 533 (N.D. Cal. 2012) ...................................................... 35

*Thompson v. Runnels*,
    705 F.3d 1089 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 234
    (2013)............................................................................................ 25

*United States v. Pallares–Galan,*
    359 F.3d 1088 (9th Cir. 2004).............................................................25

*United States v. Wilkes,*
    744 F.3d 1101 (9th Cir. 2014).............................................................11

## Statutes

28 U.S.C.
    § 1446(b)...............................................................................................5
    § 1447(d).............................................................................................12

Cal. Civ. Code
    § 2923.6(c)..........................................................................................35
    § 2923.6(h)..........................................................................................34

v

IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

### JAMES A. BADAME and DIANE M. BADAME,
*Plaintiffs—Appellants,*

*v.*

### JP MORGAN CHASE BANK, NA,
*Defendant—Appellee.*

---

# APPELLANTS' REPLY BRIEF

---

## INTRODUCTION

Chase's removal was procedurally defective, and Chase has no persuasive response to the Badames' removal arguments. The appropriate remedy comes from *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-09 (1941): vacate the judgment and remand to state court. Ignoring *Shamrock*, Chase relies (Red 58-59) on *Caterpillar Inc. v. Lewis*, 519 U.S. 61 (1996). But *Caterpillar* is different—the defect in that case was cured (unlike here) and the defect did not involve removal procedure. *Caterpillar* does not overrule *Shamrock*, and our case is governed by *Shamrock*.

Even if *Caterpillar* governed, its "cure" rule is discretionary, and in this case, considerations of finality and economy should lead to a remand because this case was terminated well before trial and involves thorny state law issues. Remand would allow these state law issues to percolate in state court—the Badames' chosen forum.

If this Court nonetheless reaches the merits of the Badames' claims, it should reverse the summary judgment.

On the merits, Chase tilts the playing field by taking inferences in its favor throughout its brief (which the summary judgment standard disallows). For example, Chase claims (despite evidence to the contrary (*see* Blue 11, 34, 40 n.5)) that it had made a final decision to deny the Badames' loan modification application (Red 41); yet Chase also claims it did not "further review" the application because the Badames breached the postponement agreement (Red 10). Chase concedes that vice presidents who could have approved a modification never reviewed the Badames' application, but suggests "there is no evidence in the record" a vice president would have approved it. (Red 10 n.4.) Chase simply ignores the Badames' evidence. (2 ER 198 (Chase's manager: "The Neg NPV [on the

loan] looked small enough for an override exception by [vice presidents] if the rest made sense."); *see also id.* at 180, 182-83.)

Chase fares no better on the law. Chase's arguments hinge mainly on contentions of waiver and analogies to cases that don't involve loan modifications. But we cite loan-modification cases to support the Badames' claims. Those claims were presented to the district court, and this Court may address new legal arguments supporting them.

Chase negligently breached its duty to act with reasonable care when processing the loan modification application. Chase says no such duty exists. That may have been debatable when the district court entered summary judgment. But the tide has turned in California, where appellate courts are now acknowledging such a duty, *Jolley v. Chase Home Finance, LLC*, 213 Cal. App. 4th 872, 902 (2013), and on facts nearly identical to ours, *Alvarez v. BAC Home Loans Servicing, L.P.*, 228 Cal. App. 4th 941, 950 (2014). Chase's other points about fraud, negligent misrepresentation, and unfair competition are equally unpersuasive. Those claims involve triable issues, defeating summary judgment.

This Court should return this action to state court, or should otherwise reverse the summary judgment and remand for trial.

3

# ARGUMENT

## I. THE DISTRICT COURT ERRED IN DENYING REMAND BECAUSE CHASE'S REMOVAL WAS IMPROPER.

### A. Chase *could* have removed the action based on the original complaint; hence Chase *could not* properly remove later.

#### 1. An action is removable when the elements of diversity jurisdiction are facially apparent from the complaint—whether or not plaintiffs plead them expressly.

As we explained in the opening brief, this Court applies a "facially apparent" standard to ascertain the predicates for diversity jurisdiction. (*See* Blue 20-22.) This standard functions like an educated guess; a court applies common sense to a complaint's allegations. (Blue 20.)

This standard complements *Harris v. Bankers Life & Casualty Co.*, 425 F.3d 689 (9th Cir. 2005), and *Kuxhausen v. BMW Financial Services NA LLC*, 707 F.3d 1136 (9th Cir. 2013), which instruct defendants to examine a complaint's "four corners" to ascertain removability. The proper inquiry is whether—examining a complaint using common sense—a defendant has notice of facts supporting diversity jurisdiction. If so, the thirty-day clock to remove the action begins running.

Chase's three responses are without merit.

4

First, Chase misunderstands *Harris*. A pleading that does not expressly allege the facts necessary for jurisdiction may yet ""'affirmatively reveal[ ]""' those facts on its face without resorting to *other* documents. (Red 51 (quoting *Harris*, 425 F.3d at 691).) *Harris* addressed whether facts were revealed, not whether facts were pleaded. The defendant would have had to search its files to determine whether jurisdiction existed, and that is not required. But a complaint can *reveal* the predicates for diversity jurisdiction without *pleading* them. For example, a complaint omitting a dollar amount in controversy may furnish other information enabling defendant to determine that plaintiff seeks more than $75,000. That's what happened here. The Badames' complaint revealed the basis for jurisdiction on its face, without requiring Chase to rummage through its files, hence the initial pleading was removable. *See Kuxhausen*, 707 F.3d at 1141 n.3 (explaining that a defendant who *could* venture beyond the pleadings to demonstrate removability is not *obliged* to do so).

Second, while neither party has cases applying the "facially apparent" standard to the timeliness of removal under 28 U.S.C. § 1446(b) (Red 52), that does not defeat our point, which follows from the language of the statute, *Harris*, and the "facially apparent" line of cases. A defendant

must remove within thirty days of receiving a pleading revealing grounds for removal, and that necessarily includes a pleading from which the basis for removal is "facially apparent."

Third, Chase claims that because a "plausible-enough guess" doesn't establish diversity jurisdiction, *see Kuxhausen*, 707 F.3d at 1141, neither does an "educated guess." (Red 52-53.) This wordplay is irrelevant because Chase's grounds for removal were obvious, unlike in *Kuxhausen*.

The class action complaint in *Kuxhausen* sought rescission of BMW finance contracts for hundreds of customers. 707 F.3d at 1140. The average contract price per vehicle needed to exceed $25,000 to meet the aggregate amount-in-controversy requirement of $5,000,000. *Id.* at 1141. The Court thought it was a "plausible-enough guess" that the average finance contract would exceed $25,000 for luxury automobiles, like BMWs. But the Court properly determined that such a tenuous guess was insufficient to require removal. *Id.* That's because the complaint supplied no information about what portion of each class member's purchase price was financed. The average *purchase* price of each class member's BMW likely exceeded $25,000, but that says nothing about each class member's *financing* decision. Some BMW customers paid for their vehicles in cash

6

(removing them from the class), others would have financed the entire purchase price, and still others would have made a down payment and financed the rest. The wide range of possibilities, and the absence of information about class members' financing choices, rendered any calculation of the aggregate amount in controversy *no more than a plausible guess*.

The Badames' case involves no guessing about the affairs of absent class members, or what portion of a purchase price might count toward amount-in-controversy calculations. Instead, "'apply[ing] a reasonable amount of intelligence,'" as *Kuxhausen* requires, *id.* at 1140, it was facially apparent to Chase that the Badames' initial complaint was removable.

### 2. It is facially apparent from the original complaint that the Badames sought damages exceeding $75,000.

As the Badames have explained, the original complaint requested restitution (with interest) and specified $31,856 paid to Chase. (Blue 22.) In addition, the Badames requested damages for wrongful foreclosure on a home appraised at $5.5 million, emotional distress, punitive damages, and attorney's fees. (*Id.*)

7

Chase concedes "'each of these categories of relief *would likely* be valued at more than $45,000.'" (Red 57 (quoting Blue 22).) But Chase stops there, failing to add these items. As our opening brief explained, "[i]n the aggregate, it is obvious—'facially apparent'—that the Badames sought relief in excess of $75,000." (Blue 22.) Chase says it would have had to engage in "extrapolations" and guesswork because the complaint offered only "clues" that the Badames sought more than $75,000. (Red 56-57.) Not so. Chase admits it must "apply a reasonable amount of intelligence in ascertaining removability," including multiplying figures. (Red 56 (quoting *Kuxhausen*, 707 F.3d at 1140).) That torpedoes Chase's position. Restitution payments totaling $31,856, plus additional categories of relief, each likely exceeding $45,000, render it "facially apparent" from the complaint that the Badames sought more than $75,000.

### 3. It is facially apparent from the original complaint that the Badames are California citizens and Chase is not.

We have shown that the Badames' California residence raised a presumption of California domicile that the balance of the complaint's allegations confirm. (Blue 23-25.) The complaint pleaded that the Badames were "residents of" Los Angeles County; that the Badames were husband

8

and wife; that Dr. Badame was employed in California; and that the Badames had California assets. (Blue 24.) The complaint mentions no other state! (*See* Blue 25.)

Nevertheless, Chase repeats its mistake from its first, failed removal, arguing that the complaint "only demonstrated plaintiffs' residence." (Red 53; *see also id.* at 54 (citing cases in which a residency allegation alone did not support diversity jurisdiction).) Chase overlooks the significance of the complaint's other facts, claiming they "merely reiterate[ ] that [the Badames] were California residents." (Red 55.) For example, Chase ignores our explanation that "[t]he location of family is an important domiciliary factor, and both Badames reside in California." (Blue 24; *see* Red 54-55.) Chase quibbles that the complaint says only that Dr. Badame was employed at USC in 2010 (during the modification process), two years before the complaint was filed. (Red 55.) Yet Chase's authority is *Harris*, which addressed a *thirty*-year-old allegation of residency. 425 F.3d at 695-96. *Harris* has nothing to say about comparatively *current* events, like Dr. Badame's employment. (Blue 24.) Finally, Chase says nothing about location of assets and intent to remain in California. (*See id.*)

Because many facts in the complaint reveal the Badames' citizenship, Chase misses the mark in characterizing this as a case where "an 'allegation of residence [is] insufficient to establish . . . citizenship.'" (Red 55.) Chase is singing the same tune from its initial removal, which the district court rejected sua sponte because Chase alleged domicile based on "information and belief," and cited the complaint's allegation of residency alone. (2 ER 58.) Chase's still-unchanged misreading (or failure to apply a reasonable amount of intelligence while reading) the complaint led to the initial remand.

## B. Under *Shamrock*, Chase's procedural errors in removal warrant vacatur of the judgment and a remand to state court, and nothing in *Caterpillar* requires a different result.

As the Badames showed in their opening brief, violations of procedural removal requirements can—and, in this case, should—precipitate a remand to state court. (*See* Blue 25-26 (citing *Shamrock*).) Because the facts of our case are closest to *Shamrock*, it controls, not *Caterpillar*. It speaks volumes that Chase neither cites nor discusses *Shamrock*. Instead, Chase dismisses decisions like *Shamrock* because they predate *Caterpillar*. (Red 59 n.23.) But earlier Supreme Court precedent controls until expressly overruled, *see Agostini v. Felton*, 521 U.S. 203, 237

10

(1997); *United States v. Wilkes*, 744 F.3d 1101, 1109 (9th Cir. 2014), and Chase's reliance (Red 58-59) on *Caterpillar* is misplaced in any event.

In *Caterpillar*, the defendant removed when the parties were not diverse, but all parties were diverse by the time of trial and judgment. The Court established a new rule allowing (but not requiring) affirmance when a jurisdictional defect is cured before judgment. 519 U.S. at 75. "Once a diversity case has been tried in federal court, . . . considerations of finality, efficiency, and economy become overwhelming." *Id.*

Those considerations trumped the *Caterpillar* plaintiff's choice of forum following a jury trial. *Id.*; *see also id.* at 76 (citing situations involving "'years of litigation'" before summary judgment, or where "'there is complete diversity throughout trial'"). This case is different. The district court ended the Badames' case just seven months after removal (*compare* 2 ER 236, *with* 2 ER 241), not after years of litigation or a jury trial. This case bears no resemblance to *Caterpillar*'s posture.

Chase favors a blanket rule that orders denying remand are unreviewable unless there is no jurisdiction when judgment is entered. That rule cannot be found in *Caterpillar*, and this Court does not apply that rule. *See Destfino v. Reiswig*, 630 F.3d 952, 955-56 (9th Cir. 2011)

(considering on its merits—not rejecting under *Caterpillar*—an argument that removal was procedurally defective). It is sensible that *Caterpillar* stopped short of endorsing that blanket rule—the Supreme Court would have had to overrule *Shamrock*, which it declined to do. In any event, while the pertinent statute, 28 U.S.C. § 1447(d), prohibits review of *remand* orders, it does not prohibit review of orders *refusing to remand*, and on that basis the district court's order here is open to appellate review.

Finally, even if *Caterpillar* applied, it teaches only that a court is "*permit*[*ted*] . . . to treat as cured a procedural defect in the removal process corrected before entry of judgment." *Parrino v. FHP, Inc.*, 146 F.3d 699, 703 n.1 (9th Cir. 1998), superseded on other grounds in *Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 681 (9th Cir. 2006). This Court should not exercise discretion to retain the case because (a) it was decided on a dispositive pretrial motion, (b) after only seven months in federal court, and (c) key issues of California law remain disputed.

The district court's error denied the Badames the forum of their choice; this Court should vacate the judgment and direct a remand.

12

## II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO CHASE BECAUSE MOST OF THE BADAMES' CLAIMS PRESENT TRIABLE ISSUES OF MATERIAL FACT.

### A. *Negligence.* There is a triable factual issue as to whether Chase breached its duty to act with reasonable care in handling the Badames' loan modification.

#### 1. California decisions now recognize that a lender owes a duty of care once it agrees to consider and process a loan modification application.

We showed in the opening brief that California decisions (though not uniform) can and should be read to acknowledge a duty not to negligently process a loan modification application. (Blue 27-33.) Rather than "radical[ly] depart[ing] from settled California negligence law," as Chase would have it (Red 24), recent decisions follow well-worn principles in applying the *Biakanja* factors. Those factors remain the touchstone for ascertaining whether a duty of care is owed, *e.g.*, *Beacon Residential Cmty. Ass'n v. Skidmore, Owings & Merrill LLP*, 59 Cal. 4th 568, 574, 578, 585-86 (2014), and the California Supreme Court has long *rejected* invitations, like Chase's (*e.g.*, Red 19), to ignore them, *see*, *e.g.*, *Stewart v. Cox*, 55 Cal. 2d 857, 863 (1961) ("The liability of a contractor or subcontractor must be determined by applying this general test [from *Biakanja*] rather than by arbitrarily placing them in a separate category subject to a special rule.").

Chase appears to theorize that a lender lending money is generally liable only in contract (*see* Red 17-22), but even that proposition doesn't help Chase, which stepped outside its contractual obligations to the Badames by agreeing to consider their loan modification application. Chase would prefer (Red 18-20) to dispense with the *Biakanja* factors and to ask only whether the lender acted outside "its conventional role as a mere lender of money," citing *Nymark v. Heart Federal Savings & Loan Ass'n*, 231 Cal. App. 3d 1089 (1991). Like Chase, some courts have seized on *Nymark*'s broad language to resolve loan modification cases like ours, inadvertently wrenching *Nymark*'s holding out of context. (*Compare* Red 19-20, *with* Blue 31-32 (explaining what *Nymark* actually holds).)

The most recent loan modification decisions from California appellate courts have taken a different (and correct) approach. *Alvarez* held that "the *Biakanja* factors clearly weigh in favor of a duty" "because defendants allegedly agreed to consider modification of the plaintiffs' loans." 228 Cal. App. 4th at 948. *Alvarez* distinguished situations where a lender declines to consider a loan modification, or where it considers the application and exercises due care. *Id.* at 948-949. That is not our case, yet Chase mischaracterizes the Badames' claim as resting on a duty to approve a

14

modification. (*See, e.g.*, Red 20 (arguing against a duty to properly handle applications to prevent foreclosure); Red 26 (cautioning against "a flood of expensive lawsuits against lenders whenever they determine that a loan-modification request should be denied").) *Alvarez* simply recognized a lender's duty to exercise reasonable care in reviewing a loan modification once (as here) the lender has committed to considering it. *See* 228 Cal. App. 4th at 944.

*Alvarez* has been cited in dozens of decisions, including cases in every federal district court in California and in five of the six California courts of appeal; not one court has disagreed with *Alvarez*'s reasoning.[1]

Unable to dispute *Alvarez*'s rapid acceptance, Chase resorts to name-calling, describing the analysis in *Alvarez* as "freewheeling" (Red 24), "unaccountabl[e]" (Red 23), and "radical" (Red 24), among other epithets. A

---

[1] *See, e.g.*, *Segura v. Wells Fargo Bank, N.A.*, No. CV-14-04195-MWF (AJWx), 2014 WL 4798890, at *13 (C.D. Cal. Sept. 26, 2014) ("While sympathetic to [the bank's] arguments, this Court must be directed by California law as established by the California courts, and it determines the decision in *Alvarez* to be the most relevant, recent, and well-reasoned decision on the question."); *Medrano v. Caliber Homes Loans, Inc.*, No. EDCV 14-02038-VAP (DTBx), 2014 WL 7236925, at *11 (C.D. Cal. Dec. 19, 2014) ("The California courts of appeal now recognize that lenders cannot offer modifications, generally, and then claim they have no duty to avoid processing the applications for those modifications in a slipshod manner.").

bevy of jurists have disagreed. To the extent California law was once unclear, it is now clear that lenders owe the duty of care alleged by the Badames. Banks must act reasonably once they have agreed to process a loan modification request.

## 2. The *Biakanja* factors confirm the existence of that duty.

We demonstrated in the opening brief why the *Biakanja* factors require courts to recognize a duty of care. (*See* Blue 29-30.) We will not repeat that analysis here, other than to respond to Chase's alternate (and incorrect) analysis of those factors.

*Factor 1: The transaction was intended to affect the Badames.*

Chase argues that because a lender acts in its own interest when deciding whether to modify a loan, the transaction is not intended to affect borrowers, like the Badames. (Red 25.) Chase's argument addresses the wrong inquiry: the cases ask whether, from the defendant's perspective, the transaction *will likely affect* (*or benefit*) the plaintiff, not whether the defendant was acting *with the altruistic motive* of benefitting the plaintiff. Chase's argument is therefore immaterial. For example, in *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958), and in *Sabella v. Wisler*, 59 Cal. 2d 21, 28 (1963), defendants were acting in their own interests—they were

16

working for their own profit and not to benefit plaintiffs. Yet in both cases this first factor weighed in favor of recognizing a duty because defendants knew the transaction would affect plaintiffs. *See Biakanja*, 49 Cal. 2d at 650 (determining that a notary's drafting of a will was intended to affect the beneficiary, even though the notary had no reason to want to aid the beneficiary); *Sabella*, 59 Cal. 2d at 28 (determining that a house was "intended for" its buyers, so the builder (although working for his own profit) owed them a duty of care).

It is obvious that the proposed loan modification was intended to affect the Badames—it would have altered their relationship with, and obligations to, Chase. (*See* Blue 29.)

*Factor 2: It was foreseeable that the Badames would lose the opportunity to keep their home.*

Chase does not directly dispute the foreseeability of harm; instead, Chase argues that policy considerations should outweigh this factor. (Red 26.) But as *Alvarez* explained, the California legislature has expressed "'a public policy of preventing future harm to home loan borrowers,'" 228 Cal. App. 4th at 948, and that policy "strongly favors imposing a duty of care" on banks agreeing to process modification applications, *id.* at 950.

_Factor 3_: The Badames' injury was "certain" because they could not keep their home once Chase bungled the loan modification application.

Chase argues a modification might not have been granted even if the loan were processed correctly, and thus it was uncertain whether the Badames would be injured. (Red 27.) _Alvarez_ allowed that a modification may not be granted, but nevertheless called such an injury "certain" because plaintiffs lost the _opportunity_ to modify the loan—that loss became certain once the bank mishandled the application. 228 Cal. App. 4th at 948.

Chase also implies that the foreclosure may not have deprived the Badames of the opportunity to keep the property because, _five months after the foreclosure_, Mr. Badame lost his job. (Red 27.) This implication is absurd. No matter what happens in the future, a plaintiff's injury is certain if it causes immediate harm. Here, the Badames lost the opportunity to keep their home once Chase mishandled their application.

_Factor 4_: There is a close connection between Chase's mishandling of the loan modification application and the Badames' injury.

Ignoring _Alvarez_, Chase argues that its conduct and the Badames' injury are unconnected because the Badames were behind in making loan

18

payments. Chase again misunderstands the harm, which is the Badames'
lost opportunity to modify their loan and keep their home (had Chase
applied reasonable care). That harm is "close[ly]" connected to Chase's
conduct here. *See Alvarez*, 228 Cal. App. 4th at 948.

*Factor 5: The policy of preventing future harm to borrowers justifies
imposing a duty on lenders.*

In two respects, Chase misunderstands the import of recent
legislation to help homeowners navigate loan modifications. Although the
legislation lacks retroactive effect (Red 29 n.10), its enactment reflects the
state's continuing public policy. *See Alvarez*, 228 Cal. App. 4th at 948
(citing *Jolley*, 213 Cal. App. 4th at 903).

First, Chase misreads *Aas v. Superior Court*, 24 Cal. 4th 627, 643
(2000), which held that builders owe no duty to homeowners for
construction defects that cause no property damage. The reasoning Chase
attributes to *Aas* (*see* Red 29) is wrong. The *Aas* holding rested on
*Biakanja*'s third factor (certainty of plaintiff's harm). 24 Cal. 4th at 646.
The court identified no "'appreciable harm'" where construction defects
"have not ripened into property damage, or at least into involuntary out-of-
pocket losses." *Id.* Chase notes the court's concern about preempting the

legislative process with a judicially created rule of tort liability. (Red 30.) That concern made sense in *Aas*, where there were other remedies available to plaintiffs. Chase claims the Badames should have *no* remedy; under Chase's logic, no court should determine that there is *ever* a duty under *Biakanja*, for fear of preempting the legislative process.

Second, Chase assumes banks will no longer process loan modification applications if they might be liable for negligently processing them. (Red 30-31.) Wrong. Banks will continue to modify loans for the simple reason that it serves their interests; the NPV shows the bank whether it is better off modifying the loan. (*See* Red 25 ("[T]he NPV calculation . . . tests whether the *lender's* anticipated return under the modification exceeds its anticipated recovery through foreclosure.").) Just as people don't stop driving even though they will be liable for driving negligently, banks can be counted on to modify loans when they stand to gain by doing so, even if they can be held liable when they're negligent. *See Alvarez*, 228 Cal. App. 4th at 951.

<u>*Factor 6*</u>: *Chase's conduct could be thought morally blameworthy.*

Chase argues it wasn't morally blameworthy because it didn't cause the Badames to need a loan modification, and because "Chase both held

the loan and serviced it, and . . . plaintiffs have never asserted any conflict of interest." (Red 28.) This argument ignores many of the Badames' allegations. To borrow Chase's phrase, it is "far from certain" (Red 27) no moral blame attaches to Chase's conduct. Chase lied about the status of their application, and accepted payments to postpone foreclosure to have "time" to process the Badames' application, but then did so negligently.

Finally, Chase quotes *Alvarez* for a proposition at odds with its holding: "as sophisticated individuals with backgrounds as executives in the financial industry, plaintiffs were in the position to "'protect [their] own interests in the loan modification process.'"'" (Red 28 n.9 (quoting *Alvarez*, 228 Cal. App. 4th at 949).) Chase ignores *Alvarez's* explanation that, "[w]ith respect to whether defendants' conduct was blameworthy— the [six]th *Biakanja* factor—it is highly relevant that the borrowers 'ability to protect his own interests in the loan modification process [is] practically nil' and the bank holds 'all the cards.'" 228 Cal. App. 4th at 949. That is true here. The Badames' dogged efforts to protect their interests went for naught, no matter their "sophisticat[ion]." (Red 28 n.9.)

**3.    The record reveals a triable issue of fact as to whether Chase breached its duty to act with reasonable care while processing the Badames' loan modification.**

The Badames have established that Chase breached its duty to apply reasonable care when processing the Badames' application, including by lying to them. (Blue 33-36.)

Chase ignores five of the nine breaches we identified (*id.*; *see* Red 31), confirming that triable issues remain. For the remaining four breaches, Chase rehashes failed arguments about duty (Red 31-32), failing to join issue with our arguments about breaches of that duty. Chase has no argument that it acted reasonably in processing the application.

**4.    Chase's conduct harmed the Badames.**

As we have shown, Chase's breaches of duty harmed the Badames: (1) they lost the opportunity for a loan modification (*see* Blue 36-37); (2) they lost time repeatedly contacting Chase and re-preparing documents (Blue 37); and (3) they paid Chase $31,856.54 to process their application (*id.*). Chase wrongly contends these harms are not cognizable.

*Lost opportunity to modify*. Chase claims that the lost opportunity to modify the loan is not cognizable because the Badames owed Chase more than their home's market value. (Red 32-33.) But Chase admits the home

22

was appraised for $3,350,000 in February 2010, a sum exceeding the $3,256,749.86 owed at foreclosure. (2 ER 93; Red 33.) Chase asserts (Red 33) that a more recent "appraisal" showed a lesser value, $3,200,000, but it cites no appraisal, only a "Mod Summary Report" showing a value Chase ascribed to the property ("Latest Value") based on unknown factors. (2 ER 190.) Because Chase cites no appraisal, there is no undisputed evidence that the Badames owed Chase more than their home was worth. At summary judgment, then, the only undisputed evidence—the February 2010 appraisal—shows the Badames *did have* equity just months before the foreclosure.

Even if the Badames owed Chase more than their home's value at foreclosure, Chase cites no loan modification cases to support its argument. Nor could it. Borrowers regularly seek modifications (instead of refinancing) when they owe more than the home is worth. *Alvarez* recognizes that a lost opportunity to modify a home loan is harmful. 228 Cal. App. 4th at 949. The very fact that statutes now protect borrowers and encourage modification proves that the opportunity to modify benefits the borrower. It follows that losing that opportunity can be harmful.

*Lost time dealing with Chase.* Chase assumes the Badames spent nominal time "'assembling'" their application. (Red 34 (quoting *Lueras v. BAC Home Loans Servicing, LP*, 221 Cal. App. 4th 49, 79 (2013)).) Possibly. But the Badames did much more than assemble an application. Unlike the *Lueras* plaintiff, the Badames engaged in protracted, hellish negotiations with Chase, "repeatedly preparing documents" at its request; they even listed their temporary home for sale at Chase's request (2 ER 155-56). Those extensive efforts, coupled with the emotional distress they precipitated, are compensable.

*Lost fee of $31,856.54.* Chase makes two arguments that the Badames were unharmed by paying Chase $31,856.54 to (temporarily) postpone foreclosure. Neither has merit.

First, according to Chase, the Badames got what they bargained for—a postponement. (Red 34.) The record doesn't support that argument. Chase told the Badames it needed more time to process their application, and that it lacked that time because a sale was scheduled. The Badames paid Chase $31,856.54 as the price of postponement. That gave Chase time to calculate the NPV, but Chase did so negligently, overlooking Mr. Badame's social security income. How Chase can believe the Badames

24

were unharmed (because Chase *did* postpone the sale) is mystifying. Chase failed to process the Badames' application with reasonable care. Absent a correct NPV calculation, the Badames couldn't avoid foreclosure. The harm is obvious.

Second, Chase says the Badames were unharmed because they paid money they owed anyway (on the mortgage). (Red 34-35.) Crediting all inferences in the Badames' favor, however, Chase agreed to calculate the NPV with reasonable care once the foreclosure sale was postponed. Chase never did. That was harmful because it left the Badames powerless to avoid foreclosure after the brief postponement.

*Waiver*. Chase argues some of the Badames' damages theories should not be considered because they were not raised in opposing summary judgment. (Red 33-34.) Like Chase's other waiver arguments (*see* Red 36, 38-39, 42), this argument fails because the Badames presented all of their *claims* to the district court, and this Court "may consider new legal arguments raised by the parties relating to claims previously raised in the litigation." *Thompson v. Runnels*, 705 F.3d 1089, 1098 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 234 (2013); *United States v. Pallares–Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004) ("[T]he Supreme Court has made clear [that] it

25

is claims that are deemed waived or forfeited, not arguments."). Even if the Badames were raising different claims (they are not), this Court "may review purely legal issues raised for the first time on appeal if the record was fully developed," *Scott v. Ross*, 140 F.3d 1275, 1283 (9th Cir. 1998), and here Chase has mentioned no issues requiring further development to respond.

**B.** ***Fraud and negligent misrepresentation.* There are triable issues about whether Chase made negligent misrepresentations—or lied—to the Badames.**

    **1.    Fraud and negligent misrepresentation claims involve deceit. Despite its name, negligent misrepresentation is not a species of negligence.**

Fraud and negligent misrepresentation claims have the same elements, with the exception of defendant's state of mind about the representation. (Blue 37-38.)

A plaintiff need show no "duty" to sue for fraud. The same is true for negligent misrepresentation, but even if the law were otherwise, "a lender does owe a duty to a borrower to not make material misrepresentations about the status of an application for a loan modification or about the date, time, or status of a foreclosure sale." *Lueras*, 221 Cal. App. 4th at 68; *see also Rufini v. CitiMortgage, Inc.*, 227 Cal. App. 4th 299, 309 (2014).

Chase's contrary arguments (Red 35-38) ignore this reality, as well as the force of precedent like *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 407 (1992).

> **2.    The Badames' evidence showed Chase was affirmatively deceitful or unreasonably untruthful.**

The opening brief identified three statements by Chase satisfying the elements of fraud or negligent misrepresentation. (Blue 39-41.) Two of Mr. Slade's statements caused Mr. Badame not to send the postponement-agreement payment. (*See* Blue 39-40.) On August 24, Mr. Slade said he had authority to "extend the time [to pay] for one day" (2 ER 156), even though Chase later claimed the Badames breached the written agreement by not timely paying (Blue 39-40). On August 25, Mr. Slade deceived Mr. Badame into believing that Chase had correctly re-calculated the NPV, but had decided to deny the modification application. (Blue 40.) A third statement from Chase, in its September 1 letter, misrepresented the status of foreclosure proceedings. (Blue 41.) Chase's responses to these misrepresentations are unpersuasive,

a. Chase argues Mr. Slade had authority to accept late payment, but not to change the written agreement's terms. (Red 38-39.) Nonsense.

Chase agreed, *in advance*, to change the payment deadline (Blue 10); Mr. Slade misled the Badames into believing it was unnecessary to change the written agreement (2 ER 156), but in reality, Chase left the written agreement unmodified so it could later claim the Badames breached by not timely paying. (*See* Blue 39-40.) In other words, Chase induced a breach of the written agreement (to its advantage (*see* Blue 34)) by purporting to change the payment deadline orally.[2]

Chase argues the Badames might not have relied on Mr. Slade's misstatement because, in the second amended complaint, the Badames wrote they could not send payment until August 25 (one day after payment was due) because of work commitments. (Red 39.) But Mr. Badame explained that while his and Dr. Badame's work schedules were tight, making the payment would not have been impossible. (*See* 2 ER 155-56.) "Mr. Slade agreed that proof of delivery could be made on August 25. Had Mr. Slade stated that the August 24 date was firm or would be an issue, I would have undertaken whatever efforts were necessary to make the

---

[2] Mr. Slade's discretion to accept a late payment makes sense when exercised *after* a breach (to excuse it). It would make no sense to say that Mr. Slade may change a payment deadline prospectively if Mr. Slade cannot change written terms—unless, as seems true here, Chase sought to *induce* a breach while continuing its charade of re-evaluating.

payment prior to the deadline in his E-mail . . . ." (*Id.* at 156.) Obviously, the Badames would have paid on August 24 if Chase told them it was necessary to keep their home; only their reliance on Mr. Slade's statement caused them to postpone.

b. Chase says the Badames' claim "rests on a tortured reading of internal Chase emails" from August 25. (Red 41.) Not so. As we have explained, Mr. Slade emailed colleagues asking whether using correct inputs would change the NPV calculation. (Blue 40 n.5.) One minute later, without receiving any response, Mr. Slade informed Mr. Badame that the application had again been declined. (*Id.*) Chase infers that Mr. Slade learned the application was declined during that one minute gap. (Red 41.) But this appeal arises from a summary judgment, and Chase may not draw those inferences in its favor. In any event, Chase's inference cannot be credited where Mr. Slade doesn't remember receiving a response, Chase has produced no response, and Mr. Slade's supervisor testified that the NPV was never re-calculated using correct inputs. (Blue 11.) Once more, Chase has succeeded only in showing that triable issues exist.

Chase also argues Mr. Slade's statement was not a "'positive assertion.'" (Red 40.) But Mr. Slade *told* Mr. Badame the modification

29

request *was again denied* because of "'inadequate income.'" (2 ER 157.) That was an assertion of fact, not an omission.

c. Chase argues the Badames knew Chase had foreclosed earlier, and so did not justifiably rely on the September 1 letter. (Red 42.) But Chase still owned the property—Chase sold the property to itself. It was therefore reasonable to believe Chase could unwind its mistake and complete the modification process it promised to handle accurately.

### 3. Chase's deceit harmed the Badames.

Chase asserts the Badames weren't harmed by its statements (Red 43, 45-46), but they were harmed for the same reasons Chase's negligence harmed them. (*Supra* pp. 22-26.)

Moreover, contrary to the district court's ruling and Chase's argument (*see* Red 43), the harm from Chase's premature foreclosure was not merely the home's rental value during the 15-day postponement agreement, but rather the lost chance to have their application processed correctly—the lost chance to keep their home. Chase is wrong when it says the Badames seek only $31,856.54 in damages. (Red 46; *see* Blue 40-43 (describing the lost chance to modify and the lost time repeatedly contacting Chase and re-preparing documents).)

30

### 4. The record supports the Badames' concealment theory.

Before its supposed second calculation of the NPV, Chase concealed it had declined the Badames' loan modification application, which forms the basis for a viable fraud claim. (Blue 41-43.)

Chase contests any duty to *immediately* reveal its decision, but the Badames haven't argued for immediacy. (Red 43-44.) Our point is that Mr. Slade didn't reveal Chase's decision for at least five days despite Mr. Badame's repeated inquiries; Mr. Slade waited until the day before foreclosure. (Blue 42.) Chase has conceded Mr. Slade should have notified the Badames "as soon as he was aware," and definitely within 24 hours, because foreclosure was looming. (2 ER 181.) That supports a triable claim of fraud by omission. (*Contra* Red 44 n.16.)

Chase says Mr. Slade's actions belie any intent to defraud because when Mr. Badame complained that the NPV was calculated incorrectly (Red 44), Mr. Slade offered to recalculate if the Badames paid an additional $15,933 (Red 8-9, 44-45; Blue 10). But the inferences from this episode favor the Badames. Instead of offering to fix Chase's mistake, Mr. Slade seized on it to justify charging an additional $15,933 to perform work that was promised earlier. Mr. Slade claimed the money was

31

necessary to postpone the sale, *but he caused the time crunch by delaying notification to the Badames*. He extracted every dollar he could by holding out the promise that the Badames' application could be fairly considered. In fact, Chase had no plans to properly process the application.

This omission plainly harmed the Badames. Chase's contrary argument mischaracterizes our position. (Red 45.) "Had Mr. Slade told the Badames earlier that Chase had declined the modification, they would have had time to pay under the postponement agreement, and the foreclosure sale would have been postponed." (Blue 42-43.) The fact that Mr. Slade deceived the Badames into not sending payment on the day of the foreclosure sale does not diminish the harm attributable to the fraudulent omission.

**C.**    *UCL violation.* **The record shows Chase acted unfairly and fraudulently during the loan modification process.**

As the opening brief showed, in violation of the UCL, Chase engaged in now-illegal dual tracking and misrepresented the Badames' right to challenge Chase's NPV calculation. (Blue 45.) To stop foreclosure before Chase had made a final decision on their application, the Badames paid

Chase $31,856.54—money the Badames should receive as restitution. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1152 (2003).

Chase argues it didn't violate the UCL, but its arguments are unavailing.

1. Chase argues the September 1 letter didn't misrepresent the Badames' right to challenge the NPV calculation because they knew Chase had already foreclosed. (Red 46.) This argument fails. The Badames reasonably believed Chase could correct its calculations and return the home, which had not been sold to a third party. (*See supra* p. 30.)

2. Chase argues the Badames first raised a "claim" of dual tracking too late—in opposing summary judgment. (Red 47.) But their *claim* is that Chase violated the UCL, and that claim appeared in the complaint, along with background facts detailing Chase's dual tracking incorporated into the UCL claim. (2 ER 72-79, 84.)

3. Chase says the statute on dual tracking doesn't apply retroactively, so it cannot ground a UCL claim. (Red 47.) But California courts have rejected this argument, which fails for the reasons above (*supra* p. 19) and in the opening brief (*see* Blue 45).

33

4. Chase claims the dual-tracking bar applies only to owner-occupied residential properties, which the Badames' home was not. (Red 48.) But the Badames had lived in the home for eight years and planned to return from their temporary residence after renovations. (*Id.*; *see* Blue 3.) These facts are consistent with owner-occupied property. Plus, Chase is equitably estopped from making this argument because it repeatedly assured the Badames it would treat their loan as one for owner-occupied property, and that it made no difference if they returned immediately or waited until a loan modification was complete. (2 ER 158.) Moreover, the policy prohibiting dual tracking of owner-occupied properties applies equally to the Badames' home, where they had lived and where they planned to return (*see* Blue 3).

5. Chase argues the dual-tracking statute only prohibits recording a notice of sale after a loan modification application is complete, and that the Badames' application was not complete before Chase recorded the notice of sale. (Red 48.) Whether the Badames' application was "complete" in May 2010 when they submitted their modification request and supporting documents is disputed. *See* Cal. Civ. Code § 2923.6(h) (West Supp. 2014) (mortgage servicer's timeframes must be "reasonable");

(Blue 5-6). In any event, recording a notice of trustee's sale after receiving the application and supporting documents but before deeming it complete flies in the face of the *public policy* undergirding the dual-tracking bar. Further, Chase's actions are prohibited by the dual-tracking statute because Chase foreclosed without complying with the *second half* of section 2923.6(c). And it is undisputed that Chase set a new sale date while processing the application. (Red 6.) Bottom line: Chase proceeded on two tracks—loan modification and foreclosure. That violated the UCL.

6. Chase contends the Badames are not entitled to restitution because they "owed [the $31,856.54] under the defaulted loan." (Red 50.) Not so. Crediting inferences favoring the Badames, those payments gave Chase "time" to process the Badames' application—time Chase needed *because it dual-tracked*. Restitution is required because Chase may not retain a benefit of unfair business practices. Even where borrowers make modified *loan* payments during trial modification periods, courts hold they are entitled to restitution when the lender nevertheless foreclosed. *See, e.g.*, *Sutcliffe v. Wells Fargo Bank, N.A.*, 283 F.R.D. 533, 540, 548-49 (N.D. Cal. 2012).

## CONCLUSION

This Court should vacate the judgment and order the action remanded to state court. Alternatively, on the merits, the Court should reverse the summary judgment and remand for trial.

April 8, 2015

**HORVITZ & LEVY** LLP
  PEDER K. BATALDEN
  LISA M. FREEMAN
**GREBOW & RUBIN,** LLP
  ARTHUR GREBOW
  JULIE H. RUBIN

By:        s/Lisa M. Freeman

Attorneys for Plaintiffs—Appellants
**JAMES A. BADAME and DIANE M. BADAME**

36

**CERTIFICATION OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION, TYPEFACE
REQUIREMENTS, AND TYPE STYLE REQUIREMENTS
[FED R. APP. P. 32(a)(7)(C)]**

☒ 1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    ☒ this brief contains 6,954 excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

    ☐ this brief uses monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

☒ 2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒ this brief has been prepared in a proportionally spaced typeface using MS-Word in 14-point Century Schoolbook font type, or

    ☐ this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

April 8, 2015
_____
Date

s/Lisa M. Freeman
_____
***ATTORNEY NAME***

37

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2015, I electronically filed the foregoing **APPELLANTS' REPLY BRIEF** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.


Signature: s/ Lisa M. Freeman